IMPERIAL AMERICAN RESOURCES
FUND, INC., Appellant,

v.

RAILROAD COMMISSION OF TEXAS
et al., Appellees.

No. B–6513.

Supreme Court of Texas.

Sept. 27, 1977.

Scott & Douglass, Ivan D. Hafley and Frank R. Douglass, Austin, for appellant.

John L. Hill, Atty. Gen., Linward Shivers, Asst. Atty. Gen., Graves, Dougherty, Hearon, Moody & Garwood, Dan Moody, Jr., and Robert C. Grable, Austin, for appellees.

DANIEL, Justice.

This is a direct appeal from a trial court judgment upholding the validity of a Railroad Commission Rule 37 Order and denying plaintiff's request for an injunction against the Commission and the holder of the Rule 37 Exception Permit from proceeding under the order.

The plaintiff, Imperial American Resources Fund, Inc., filed this suit against the Railroad Commission and BTA Oil Producers on October 12, 1976, attacking the validity of an order of the Commission dated September 20, 1976, granting the Rule 37 Exception Permit for BTA to drill a gas well on its 644.16 acre JV-P Riggs lease in the Gomez (Ellenburger) Field in Pecos County. The Gomez Field Rules adopted in 1967 permitted one gas well on each 640 acres and provided that no well is to be drilled nearer than 1980 feet to any property or lease line. Under these Field Rules and the Commission's Statewide Rule 37, exceptions to these distances may be permitted upon the Commission's determination "that such exceptions are necessary either to prevent waste or to prevent the confiscation of property." [1]

BTA Oil Producers applied for an exception so that it might drill in the northeast portion of its lease at a location 1320 feet instead of 1980 feet from its north and east lines. It alleged that such location was necessary to penetrate the area of higher structure and good sand permeability and thus obtain a reasonable opportunity to produce the hydrocarbons under its lease. BTA further alleged that it would otherwise suffer confiscation through net uncompensated drainage by wells on adjacent tracts. Imperial American, owner of a 640 acre lease adjoining the BTA lease on the north, opposed BTA's application for the exception. See map on following page for relative locations.

1. See Rule 37(A)(1). Statewide Spacing Rule, Texas Railroad Commission Oil and Gas Division.

ADAPTED FROM.
A PORTION OF
BTA EX. NO. 1
5-76

N

Imperial had one of the more prolific gas wells in the field at a location about midway between the east and west lines of its lease and about 3350 feet north of its common boundary with the BTA tract. The accompanying map, adapted from BTA's Exhibit 1, shows the relative location of the BTA lease covering Section 7 of T. & St. L. RR BLK 146 and Imperial's lease on Section 6 of the same survey. The arrow on Section 7 points to the location sought by BTA. The circle nearer the southeast portion of Section 7 indicates the location of a noncommercial gas well completed and subsequently abandoned by Texaco. Near the center of Section 6 is a circle marking the

location of Imperial's gas well. There are circles around producing gas wells on other Sections in the depicted area of the field. According to BTA's witness, the higher permeability and areas of better gas wells are shown on this map within the two dashed lines which encompass the indicated part of BLK 203, most of Section 1, practically all of Section 6, the northeast portion of Section 7, the southwest portion of Section 5, most of Section 8 and portions of Sections 9, 10, 15, 22, 21, 20, and all of Sections 13 and 14.

The Commission's order granting BTA's application was based upon eleven findings of fact from which the Commission concluded that the granting of the exception "is necessary to afford applicant a reasonable opportunity to recover the Ellenburger hydrocarbons underlying applicant's lease, or the equivalent in kind, and is necessary to protect applicant's correlative rights and prevent confiscation of applicant's property." As heretofore stated, Imperial filed this suit alleging the order to be void and seeking to enjoin the Commission and BTA from proceeding thereunder. From a trial court judgment denying the relief sought, Imperial brings this direct appeal pursuant to Article 1738a and Rule 499a of the Texas Rules of Civil Procedure.[2] We affirm the judgment of the trial court and base our opinion on the following disposition of the issues raised by this appeal.

### Applicability of the Administrative Procedure Act

Imperial's first point of error is based upon an allegation that the order prejudices the substantial rights of Imperial and is based upon unlawful procedure in that the findings of fact are not sufficient under the relatively new Administrative Procedure and Texas Register Act, which became effective on January 1, 1976.[3] This is the first direct appeal from a Railroad Commission order of this nature which has been filed with this Court since the effective date of the Act.

Consideration of Imperial's first point requires an examination of the general effect of the APA on Railroad Commission proceedings. All parties agree that the Act is applicable to the Railroad Commission and to judicial review of its orders. With a few stated exceptions, the Act applies generally to administrative agencies of the State. The Railroad Commission is not excepted. Appeal from its orders are still initiated as provided in Section 8 of Article 6049c, as follows:

"Any interested person affected by the conservation laws of this State relating to crude petroleum oil or natural gas, and the waste thereof, including this Act, or by any rule, regulation or order made or promulgated by the Commission thereunder, and who may be dissatisfied therewith, shall have the right to file a suit in a court of competent jurisdiction in Travis County, Texas, and not elsewhere, against the Commission, or the members thereof, as defendants, to test the validity of said laws, rules, regulations or orders. Such suit shall be advanced for trial and be determined as expeditiously as possible and no postponement thereof or continuance shall be granted except for reasons deemed imperative by the Court. In all such trials, the burden of proof shall be upon the party complaining of such laws, rules, regulation or order; and such laws, rules, regulation or order so complained of shall be deemed prima facie valid."

Relevant portions of the Administrative Procedure Act (Article 6252–13a) are as follows:

"Sec. 16.   .   .   .

"(b) *A final decision must include findings of fact and conclusions of law, separately stated.* Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings.   .   .   .

\*     \*     \*     \*     \*     \*

2. All statutory references are to Vernon's Annotated Texas Civil Statutes unless otherwise noted. Rule citations are to the Texas Rules of Civil Procedure unless otherwise stated.

3. Article 6252–13a, referred to herein as the Administrative Procedure Act or the APA.

"Sec. 19. . . .

"(d) If the manner of review authorized by law for the decision complained of is other than by trial de novo:

"(1) after service of the petition on the agency, and within the time permitted for filing an answer (or such additional time as may be allowed by the court), *the agency shall transmit to a reviewing court the original or a certified copy of the entire record of the proceeding under review.* . . .

"(2) any party may apply to the court for leave to present additional evidence and the court, if it is satisfied that the additional evidence is material and that there were good reasons for the failure to present it in the proceeding before the agency, may order that the additional evidence be taken before the agency on conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file such evidence and any modifications, new findings, or decisions with the reviewing court;

"(3) *the review is conducted by the court sitting without a jury and is confined to the record*, except that the court may receive evidence of procedural irregularities alleged to have occurred before the agency but which are not reflected in the record.

"(e) The scope of judicial review of agency decisions is as provided by the law under which review is sought. Where the law authorizes appeal by trial de novo, the courts shall try the case in the manner applicable to other civil suits in this state and as though there had been no intervening agency action or decision. Where the law authorizes review under the substantial evidence rule, or where the law does not define the scope of judicial review, the court may not substitute its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion but may affirm the decision of the agency in whole or in part and shall reverse or remand the case for further proceedings *if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:*

"(1) in violation of constitutional or statutory provisions;

"(2) in excess of the statutory authority of the agency;

"(3) made upon unlawful procedure;

"(4) affected by other error of law;

"(5) *not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole* ; or

"(6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." (Emphasis supplied.)

■ It is apparent from the Act and from Section 8 of Article 6049c that orders of the Commission are still deemed to be prima facie valid and subject to review under the substantial evidence rule. The principal changes are that the Commission must include in its decision findings of fact and conclusions of law [4] and judicial review is based on the record made before the administrative agency, except as to procedural irregularities mentioned in Sec. 19(d)3, *supra.*

Prior to the effective date of the Administrative Procedure Act (January 1, 1976), judicial review of a Railroad Commission conservation order was by trial in the district court upon a new record of evidence developed in the court without regard to the evidence heard by the Commission. The Commission's order was tested by the substantiality of the evidence adduced in the district court trial. The applicable substantial evidence rule was stated in *Trapp v. Shell Oil Company*, 145 Tex. 323, 198 S.W.2d 424 (1946), and refined in *Hawkins v. Texas Company*, 146 Tex. 511, 209 S.W.2d 338 (1948).

---

4. An identical requirement is also provided in Rule 91 of the Railroad Commission's General Rules of Practice and Procedure adopted November 24, 1975.

This type of substantial evidence review of a newly developed record, which often was different from the evidence heard by the Commission, came under effective criticism.[5] The Legislature first limited judicial review to the record made before an administrator in the Savings and Loan Act of 1963, Article 852a, Sec. 11.12(5)(b). The record under that Act is tested by the substantial evidence rule if an order of the Commissioner is contested. *Lewis v. Jacksonville Building and Loan Ass'n*, 540 S.W.2d 307 (Tex.1976); *Gerst v. Nixon*, 411 S.W.2d 350 (Tex.1966). Through enactment of the Administrative Procedure Act as to other agencies, the Legislature has made a far-reaching change in limiting judicial review under the substantial evidence rule to the records made before the administrative agencies. The result is that the agencies and the courts now consider the same evidence. Judicial review under the essential standards of the substantial evidence rule has been preserved, but the courts now test the substantiality of the evidence upon which an administrative agency made its decision. This furnishes more assurance of administrative due process and a surer means of determining whether an agency acted arbitrarily, capriciously, and without due regard to the evidence.

Imperial does not disagree with what has been said thus far about the APA. Neither does it assert error because the findings and conclusions were made initially by the examiner and then adopted by the Commission by incorporation as a part of its order. This practice was noted and approved by the Court in *Auto Convoy Co. v. Railroad Commission*, 507 S.W.2d 718 (Tex. 1974). Imperial complains that the findings are on ultimate issues, vague, and insufficient to support the commission's conclusion that the order was necessary to prevent confiscation of BTA's property. The relevant findings on this issue are:

"4. The Texaco USM No. 1–B well which was formerly completed as an El-

lenburger well on Applicant's lease, was incapable of producing sufficient quantities to recover the hydrocarbons underlying the lease. (Tr. 10, 12).

". . .

"7. There are good and poor producing wells offsetting BTA's lease in every direction with the good wells being to the north and east of the proposed location. (BTA Exhibit 1, Imperial-American 1).

"8. Gas wells are producing from the Ellenburger formation on each side of BTA's lease, and therefore BTA's lease is presently suffering net uncompensated drainage of Ellenburger hydrocarbons away from the lease. (Tr. 24, BTA Exhibit 1).

"9. The requested location is a reasonable location 100 feet up-structure from an abandoned well towards an area of better productivity that would provide the applicant a reasonable opportunity to recover the hydrocarbons under the lease before they are drained to offset tracts. (Tr. 24, 70, 71, BTA Exhibit 1, 3).

"10. A regular location can be drilled on the BTA lease so as to encounter the Gomez (Ellenburger) Field at 19,000 feet below sea level which would be 100 feet structurally higher than the Texaco USM No. 1–B well that formerly produced on this lease, however, the location would be in the direction of poor wells and would not provide the applicant a reasonable opportunity to produce the hydrocarbons under the lease because of the lengthy period required to produce these hydrocarbons. (Tr. 29)."

We have carefully examined these findings and tested them against the more stringent requirements of Article 911b, Sec. 5a(d) (the Motor Carrier Act) and Article 852a, Sec. 11.11(4), (Savings and Loan Act), and decisions thereunder. Imperial asserts that the findings are insufficient to meet similar statutory requirements as interpreted and applied in *Morgan Drive Away, Inc. v. Railroad Commission*, 498 S.W.2d 147

5. For instance, see Reavley, *Substantial Evidence and Insubstantial Review in Texas*, 23 SW.L.J. 239 (1969) and Walker, *The Application of the Substantial Evidence Rule in Appeals From Orders of the Railroad Commission*, 32 Tex.L.Rev. 639 (1954).

(Tex.1973); *Miller v. Railroad Commission*, 363 S.W.2d 244 (Tex.1962); *Thompson v. Railroad Commission*, 150 Tex. 307, 240 S.W.2d 759 (1951); and *Bay City Federal Savings and Loan Association v. Lewis*, 474 S.W.2d 459 (Tex.1971). We disagree. These findings are clear and explicit. They are not couched in terms other than as findings; neither are they mere conclusions, references to, recitals or summations of the evidence, or otherwise insufficient for reasons set forth in the above cases. On the contrary, they are findings upon the material issues to be reviewed and tested under the substantial evidence rule.

The findings are not set forth in statutory language, and therefore it is not required that they be accompanied by a concise and explicit statement of the underlying facts supporting the findings. While some of the findings might be more artfully worded, they are substantially as would be expected from a trial judge or a jury in answer to controlling rather than incidental fact issues. We believe they meet the statutory requirement for separate findings of fact and that they are sufficient to support the Commission's conclusions and order.

### Evidentiary Support of the Findings

By its second point, Imperial insists that the foregoing findings are not supported by substantial evidence. This point would present difficulty if our review were limited to various isolated expert testimony, such as the reluctance of the expert witness for BTA to give positive opinions and estimates as to conditions in the sands 19,000 feet below sea level, especially with reference to the amount of possible drainage from the BTA lease which may have occurred or which might occur in the future. Our review, however, must be based on the evidence taken as a whole. *Alamo Express v. Union City Transfer*, 158 Tex. 234, 309 S.W.2d 815 (1958). As in most cases of this nature, the evidence offered by the opposing parties is conflicting; so much so that contrary findings might have been supportable by substantial evidence. The rule which is likewise applicable to our review of this case was stated in *Auto Convoy Company v. Railroad Commission, supra*, as follows:

"In a judicial review of a Railroad Commission order, it is well settled that the court does not substitute its judgment for that of the administrative agency. In this regard, the question for the courts is whether the contested order is reasonably supported by substantial evidence. In appeals, the burden is upon the complaining parties to show an absence of substantial evidence and that the orders are unreasonable and unjust to them. . . . Where there is substantial evidence which would support either affirmative or negative findings, the order will be upheld, even though the Commission might have arrived at a decision contrary to that which the court might have reached. The correct test is whether the evidence as a whole is such that reasonable minds could have reached the conclusion that the Railroad Commission must have reached in order to justify its action. *Railroad Commission v. Shell Oil Co.*, 139 Tex. 66, 161 S.W.2d 1022 (1942); *Shupee v. Railroad Commission*, 123 Tex. 521, 73 S.W.2d 505 (1934). . . ."

The basic right of every landowner or lessee to a fair and reasonable chance to recover the oil and gas under his property was recognized in *Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73 (1939), and *Railroad Commission v. Williams*, 163 Tex. 370, 356 S.W.2d 131 (1961), with exceptions to spacing rules being proper when the applicants discharge their burden of proof that the exceptions are necessary to prevent waste or confiscation of property. See also the caveat in *Halbouty v. Railroad Commission*, 163 Tex. 417, 357 S.W.2d 364 (1962), with respect to exceptions which may be necessary for protection of small tract owners.

Having reviewed the entire record, we hold that the findings, conclusions, and order of the Commission are reasonably supported by substantial evidence. The evidence consisted of the undisputed physical facts and testimony from one expert wit-

ness called by Imperial and one called by BTA. It was undisputed that BTA's Section 7 lease is entirely underlaid by a productive portion of the Gomez (Ellenburger) Field; that the BTA lease is surrounded on all sides by six producing gas wells; and that there is no producing well located on the BTA lease. It is further undisputed that before farming out the Section 7 lease to BTA, Texaco drilled a gas well on the lease in 1972, at a site south of BTA's proposed location. This well was in an area of low permeability and had difficulty with salt water intrusion. When producing, it made about 500 Mcf of gas per day. Accumulated production from this well in approximately eighteen months was only about 139,500 Mcf of gas. The well was plugged and abandoned, and there has been no production from the tract in question since 1974.

Mr. Jerry Moritz, an engineer for BTA who appeared as its expert witness, testified that it would not be feasible to drill a well anywhere on the BTA lease except in the northeast portion on account of the low permeability existing in the sands underlying the remainder of the lease. It was shown that wells to the north and east of BTA's Section 7 were much better producers than those to the south and west. Some of this testimony was based upon Texaco's ill-fated experience with its abandoned well on the south half of Section 7. The physical facts, including the location of wells on adjoining Sections and their rates of production, constituted substantial circumstantial evidence in support of the finding that the BTA lease was being drained, especially by gas wells located to the north and east.

It was shown that Imperial's well on Section 6, which adjoins BTA's lease on the north, was producing between 20,000 to 25,000 Mcf per day or in the range of 600,000 to 700,000 Mcf per month. Thus, the Imperial well was producing in one month more than four times as much gas as the Texaco well on the BTA lease produced during its entire eighteen months prior to abandonment.

Mr. Gillespie, Imperial's expert, testified that the Imperial well would recover all of the gas reserves beneath its Section 6 lease, and admitted that it might drain a little, but not "much" from adjoining leases. His testimony practically negates any likelihood that a well drilled by BTA under its Rule 37 exception would prejudice substantial rights of Imperial, because of its ability to recover at a high rate of production all of its Section 6 reserves through its existing well. Mr. Gillespie stated that the proposed BTA well would have to produce more than 5,000 Mcf per day to drain gas from the Imperial lease.

Imperial insists that BTA failed to prove that drainage or confiscation would occur if the proposed well is not drilled, because the BTA expert would not testify definitely that drainage was occurring and because he admitted that a well drilled at a regular location could eventually produce the reserves beneath the BTA lease over a longer period of time. This was not all of this expert's testimony. On the contrary, he testified that a regular location for a well 19,000 feet deep was not feasible because of the low production rate in this proven area of low permeability. As to drainage and the necessity for the exception permit in order for BTA to have a fair chance to recover its hydrocarbons, Mr. Moritz testified:

"Q. If the lease is being drained, is a well needed at the requested location to reduce or prevent this drainage?
"A. Definitely. As already established, the circumstances in the field, considering structure as well as the areas where one can expect to make a good producer, are such that it is difficult, and perhaps impossible, to justify drilling on Section 7 without the requested spacing exception. Therefore, if the lease is being drained, the granting of this exception and completion of a well in the Ellenburger at the requested location is reasonably necessary in order to prevent drainage away from BTA's lease.
"Q. Then, Mr. Moritz, what conclusion do you reach about the situation faced by BTA here?

"A. Either the gas underlying Section 7 is not capable of being produced by any existing well, in which case a well on the lease is necessary to prevent waste; or, the gas underlying the section is being drained, in which case a well on the lease is necessary to protect the lease from such drainage. Perhaps the situation is such that both reasons apply. In any case, to permit BTA to drill a well on the lease, it is necessary that BTA be granted the requested exception so that the well can be located where there is a reasonable probability of making a good producer. The granting of the exception is necessary either to prevent waste or to prevent drainage, or for both reasons, and is certainly necessary to enable BTA to have a reasonable opportunity to recover the hydrocarbons underlying its lease, or their equivalent in kind."

As indicated, a review of the evidence as a whole shows that the order granting the Rule 37 Exception Permit was reasonably supported by substantial evidence.

### Finding of Fact No. 11

Finally, Imperial challenges the Commission's finding of fact No. 11 as improper and contrary to the APA and the Commission's own Rules of Practice and Procedure. We agree. The gist of that finding was that numerous Rule 37 exceptions have been granted in the Gomez (Ellenburger) Field for the purpose of allowing wells to stay as high as possible above the water level at—19,800 feet. The source of that finding was stated as "Rule 37 records of the Railroad Commission." None of these records were placed in evidence at the hearing, and the parties were not notified of the specific records of which the Commission took notice. Thus, Imperial was not afforded an opportunity to contest the material so noticed as the basis for finding No. 11.

Prior to January 1, 1976, the effective date of the Administrative Procedure Act, there was no prohibition against the Railroad Commission's use of data in its own records in deciding the cases before it. *Alamo Express v. Union City Transfer*, 158 Tex. 234, 309 S.W.2d 815 (1958). That ex parte procedure is one of the practices which the Legislature sought to prohibit with the APA requirement that notice be given of such official records which any agency intended to consider. Section 14(q) of the Act provides, in part, as follows:

"(q) In connection with any hearing held under the provisions of this Act, official notice may be taken of all facts judicially cognizable. In addition, notice may be taken of generally recognized facts within the area of the agency's specialized knowledge. *Parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material officially noticed, including any staff memoranda or data, and they must be afforded an opportunity to contest the material so noticed.* The special skills or knowledge of the agency and its staff may be utilized in evaluating the evidence." (Emphasis supplied.)

The Commission's own Rule 73, is similarly worded. The same method of judicial notice is permitted, but the law and the Rule now require notice to the parties of the material which will be judicially noticed so that any party to the hearing may contest the material. Both the law and the rule should be followed. If a showing of harm or prejudice is made because of failure of the Commission to give such notice, a reversal and remand would be required. *Lewis v. Guaranty Federal Savings and Loan Association*, 483 S.W.2d 837 (Tex.Civ. App.1972, writ ref'd n. r. e.).

We do not agree with Imperial that this procedural error requires a remand in the present case. No harm or prejudice has been shown because of the Commission's failure to give notice of the Rule 37 exceptions which it considered as a basis for finding No. 11. Imperial's objection and exception to the finding was based on "no evidence in the record" to support the finding and because the finding is "irrelevant to this case." It prayed that the finding be stricken. The objection was proper, and it should have been sustained.

However, the objection did not go to failure to notify. Furthermore, Imperial admits in its brief that the finding "does not, per se, prejudice Imperial American since it is not necessary to the Commission's Order and since it is really immaterial to the Commission's consideration of the case . . .," but it contends that this "does not negate the possibility that Imperial American was prejudiced by the Commission's consideration of this material." The burden of showing harm or prejudice on account of failure to give notice of consideration of irrelevant records was upon Imperial. Having failed to make such showing, the error is treated as harmless and not sufficient grounds for reversal. *Lewis v. Jacksonville Building and Loan Association,* 540 S.W.2d 307 (Tex. 1976); *Merchants Fast Motor Lines v. Newman,* 236 S.W.2d 646 (Tex.Civ.App.1951, writ ref'd, n. r. e.).

Accordingly the judgment of the trial court upholding the validity of the Railroad Commission's order is affirmed.

REAVLEY, J., not sitting.